The next case on the calendar is LBBW Luxemburg v. Wells Fargo. May it please the Court, I'm Tejinder Singh for the appellant LBBW. I'd like to focus today, of course I'm happy to answer any questions the Court has about the standing argument, but I'd like to focus, if I could, on the merits of the dispute before you. The District Court granted summary judgment to the defendants on the ground that they didn't make a misrepresentation to LBBW in the course of marketing this collateralized debt obligation. It's largely undisputed what they actually did. What they did was, in the course of marketing the CDO obligation, they learned that the equity tranche, the preference shares as they're called in the offering materials, could not sell for anything close to their par value. They received a bid to sell a lot of it for 88% of par value and then a bid to sell for 60%, but only if the buyer could also take out short positions against some of the CDO collateral and other securities in the CDO. For what tranche did your client buy? My clients bought the senior notes, the top three tranches of the CDO, not the preference shares. But the preference shares are still relevant to my client's purchases for a couple of reasons. The most important reason is that the cash flows for all of the securities coming from the CDO come from the same underlying pool of collateral. Therefore, if the collateral is weak, all of the CDO securities are vulnerable regardless of tranche. The tranche just tells you who gets hit first. It doesn't tell you whether any particular security is safe. What Wachovia and Fortis really learned during the course of marketing the CDO was that they could not sell these securities for near par value. And then they chose to keep them on their own books and mark them down substantially, ultimately to approximately 50%, just a little bit over. The reason this is important, I want to stress that it is the overwhelming norm in CDO transactions that when equity is sold, it is sold at par. And the representations that the defendants made to LBBW and to all investors really indicated that this would be the case. For support that this is the norm, I would point you to testimony from basically every witness in the case. Our expert report says ordinarily CDO equity will be placed at par. That's what normal investors would expect. You'll find that at page 4411 of the joint appendix. And he further clarified in his testimony, confidential appendix 541 to 42, that the behavior here was way outside the bounds of normal banking behavior. Our analyst, Bernard Heldman, had similar testimony. And we've cited testimony also from all of their salespeople saying they had not seen an instance where CDO equity was placed at less than par at the primary offering. And I want to make this point explicit. There is a big difference between marking down the value of a security before the closing even occurs and seeing it get marked down later in response to market developments in the secondary market. This is an extremely unusual circumstance and extremely odd banking behavior. And that is what makes it a material misrepresentation not to disclose it. In fact, the signals that we are getting from the defendants signal – Your point is that the defendants should have disclosed the internal markdowns? Yes. And what evidence is there in the record that the defendants thought the assets were in trouble or connecting the markdown to the value or to the fact that the assets were in trouble? I mean, the evidence seems to suggest that it was for other innocent reasons. Sure. At least the district court so concluded. Yeah. Let me address this in two ways. And so, first of all, they have offered an alternative explanation for what they're doing. And that, I think, raises nothing more than a factual question that a jury really should be able to decide. Here is the evidence that says the collateral was troubled and they knew it. First of all, just as a matter of logic, ordinarily, you will see that the price of an equity security corresponds to its risk. There is only one source of risk in these transactions, and that is the collateral. If the collateral is bad, you'll have more risk. Our witness, Eric Hurst, you'll find this at page 4409, says point blank that the amount of markdown in this case could not have been attributable only to liquidity, which is the explanation that the other side gave. It had to be attributable to credit risk. In fact, on the same page of the record, he'll say that this would have constituted distressed credit pricing at that point in 2006. There's other evidence that their liquidity-based explanation is not true. Their own witnesses, you'll find this at pages 4054 and 2279. This is Yu-Ming Wang and Michael Thompson. Both say in 2006, the market was good enough. It was liquid enough. So the liquidity explanation can't be right. It has to be something else. That something else must be credit risk. Well, they say that they were simply executing an accounting transfer under which they were netting the fee they expected against this write-down, I guess, in other words, to not have to pay taxes on them or something like that. So just to be clear, it's not because they were trying to avoid taxes. What happened to them first is they were unable to sell the equity. There are internal emails saying, we're struggling to place this equity. We can't move it. And then a decision is made, okay, let's keep it on our own books. How do we understand what the accounting effect is? I promise I will get directly there. Once they decide to keep the securities on their books, generally accepted accounting principles require them to mark those assets to their market value, that is, to the value at which they could sell them. They could not have marked those. What they try to tell you with this sort of accounting alternative explanation is basically, we could have marked it at 100. What we chose to do is not mark it at 100, but just drop the mark down by the amount of our fees, right? There is no evidence in the record that they could have marked this to 100. They had never sold any of it at 100. They sold some of it at 88, and then they got a bid to buy some of it at 60, but only in combination with short transactions. Does your argument amount to the fact that the markdown alone, plus the prices they were offered and their initial efforts to sell, is enough to show that they knew the collateral was distressed? Is there any other evidence beyond that that suggests they knew the collateral was distressed? Yes. So, there are two things. There are the things you mentioned. In addition to those, we have testimony saying, while COVIA was a massive mortgage originator, and most of the collateral in this case was residential mortgage-backed securities, their, again, this is their witness, Yu-Ming Wang, testified, you'll find this at 4060, that the mortgage market was starting to become shaky. We cited this in our opening brief as well, because teaser rates on residential mortgages were about to balloon. So, they had that independent reason to think the collateral was shaky. Beyond that, the offer that they got, which said, I'll buy this, but only if I can short the collateral. I mean, if a sophisticated institutional investor in the marketplace is coming to you and saying, I want to short the collateral, that also sends you a signal that there may be something wrong with the collateral. So, those are two independent pieces of evidence. But really, the markdown is the big evidence, and it is substantial real evidence that a jury should be allowed to evaluate against the other side's alternative explanations. To be clear, this is not slam-dunk evidence, right? This is not evidence where somebody inside Wachovia is sending someone else an email saying, look at the junky collateral that we're passing off. This is not that type of deal. But there is still, nevertheless, very compelling evidence. Because if you're using generally accepted accounting principles and talking about the market value of these securities, there is only one thing that drives this level of a markdown, and it is credit risk. And there is only one source of credit risk, and that is that the collateral is no good. So, when they can't sell this equity, anything close to par, they know, they must know. There are a lot of other issues in the case, and I see I'm out of time. Yeah. Explain to me why you have standing to bring this case. Sure. There are two ways you could think about the standing argument. There's sort of a practical way, and there's a very technical way. And either way, we win. And I'll just start with the sort of practical sense. Give me the one that you think is better. Well, it's really their argument depends on you being hyper-technical and ignoring all practical reality. So, if you're willing to walk that road with them, I can give you the technical explanation for why we win. I don't think you should ignore reality. Here's how this starts. The claim is held by LBBW Luxembourg, which at all times was a wholly owned subsidiary of a German parent company. The German parent company decides in 2014, let's get rid of this candy shell between us and the assets and liabilities of the Luxembourg business. Let's take that away and have a merger by absorption. The other side's argument is that somehow in this process of just going from indirectly owning those assets to directly owning them, the German entity just discarded this claim somehow, just threw away pending litigation for no reason. There's no legal impediment to keeping the claim. The German entity is represented by great lawyers. They file the articles. You'll find all the evidence on pages 31 and 32 of our opening brief that we've cited. The other side cites no evidence. So their description of what must have happened is silly, candidly. There is no reason a bank would do what they say we did. Now, if you think, nevertheless, maybe this was waived because there was an objection to the magistrate judge's report, then that's the sort of technical explanation. And there, too, I think we must win because, as we have explained, the magistrate judge was deciding a permissive substitution motion. In the course of deciding that motion, the magistrate judge did not find, as a matter of fact, that no transfer of interest to the German entity had occurred. The magistrate judge merely found that the evidence, as presented in connection with the substitution motions, did not carry that burden. And a lot of the magistrate judge's decision was based on the fact that some of the evidence, for example, was presented with the reply brief as opposed to the opening brief. I'm sorry? At that point, who was the plaintiff? The same party that's before you now, LBBW. It was an upstream merger, right? So the subsidiary had disappeared. That's correct. That's correct. So who was the plaintiff? So under Rule 25C, if a transfer of interest has occurred, then either the original party, the subsidiary, can stay before you, or you can substitute in the new party. Now, the question, of course, is did a transfer of interest occur? The magistrate judge did not find, to the contrary. He just found that for purposes of the substitution motion, we hadn't carried that burden. The technical point I want to make is that summary judgment is different. They have to show that no reasonable fact finder could find in our favor on this question. But we are the only side who cited any evidence, and our evidence is on point and explicit and clear. It says that all of the assets and liabilities of the subsidiary were transferred to the German parent, including specifically this litigation. And these are affidavits from two lawyers and the articles of merger themselves. And so I just don't understand how, on a summary judgment standard, you could find that no transfer of interest occurred. There just isn't a basis in the record for that finding. Thank you. Good morning. May it please the Court, Counsel. Jay Tambay from Jones Day for the Appellees of Defendants Below. I'm here with my partner, Todd Jeremia. Your Honor, when you asked the question, who's the plaintiff, I was reminded of the old commercial, where's the beef? The party that stands before you as appellant, LBBW Luxembourg, has ceased to exist. It has no further function. It doesn't appear on the records of the Luxembourg registry. And there's no dispute in this case that a dissolved corporation under Luxembourg law can't do anything, let alone maintain this lawsuit. It seems strange to me that Luxembourg law would dictate an Article III standing question. I don't believe it's an Article III standing issue. It's a capacity issue. You must have capacity to sue. Okay. So there's no standing here. This is just a capacity issue. This is a capacity issue. To answer that question further, there are cases in this context dealing with dissolved corporations that have used standing principles. So I think we cite a case from the Court of Claims called Mather. I believe it's Mather v. United States or United States v. Mather. And I think the language that's used in that case, dealing with an analogous dissolved corporation, is language of standing, that there's no Article III standing. And certainly the district court, in dealing with what he was confronted with, which is a dissolved corporation that no longer existed, a magistrate judge on two occasions finding the purported transfer has not been established and no objection has been taken to that finding, the district court concluded, there's no one in front of me who can get relief because the only entity that is appearing before me no longer exists. It seems obvious, and I think the word was also used, I believe, silly, but almost 100 years ago in Oklahoma, natural gas, the Supreme Court addressed an analogous situation. In that case, after the lower court proceedings, while the case was on appeal to the Supreme Court, the name plaintiff had dissolved. It had disappeared. And here's what the Supreme Court said there, and that's what's important. It's not silly. It's not technical. It's fundamental. You can't have an action proceeding on the basis of an entity that doesn't exist. It's analogous to the death of a natural person. Something else then needs to happen. Rule 25 can't breed life into a dead corporation. What Rule 25 can do is, if there has been a transfer, have that transferee be the substituted party. They knew that. They tried that twice. They failed twice. Now they would have this court, to continue the beef analogy, conclude that that was a nothing burger, that it doesn't matter what the magistrate judge did. They could simply ignore the magistrate judge. Rule 72 says they can't just ignore the magistrate judge. They made their submissions of evidence to the magistrate judge. He made a ruling. He said, you have sought substitution, but you haven't established a predicate for Rule 25. You haven't shown me that these claims were transferred. Now, let's get back into, as my colleague said, reality. Well, we know one thing post-financial crisis. A lot of banks failed. A lot of financial institutions failed. A lot of claims were transferred. Some weren't. There's lots of cases. If you look at the New York state courts and appellate courts, and indeed even some of the federal courts here, there are repeated discussions of, was the claim properly transferred by the entity that was allegedly harmed to some successor entity? And sometimes those claims were properly transferred. Sometimes they weren't. Among the evidence we submitted to the magistrate judge was the stark contrast between what was being suggested in the motion and what the 30B6 witness had testified to under oath. The 30B6 witness for LBBW testified under oath, yes, there was a schedule of transferred assets and liabilities. Yes, out of expected, this claim to appear. No such schedule was ever produced. The merger agreement, the contention is made that all assets and liabilities were transferred, and we made this argument to the magistrate judge. If that were the case, there would be no reason then to specifically schedule out transferred assets and liabilities, which was done in the merger agreement. It's not an agreement governed by New York law. It's not an agreement governed by Delaware law. They claim it's governed by German law. They didn't satisfy the magistrate judge as to why that was the case. It was their burden on the Rule 25 motion to carry that burden. They didn't do it. Let me switch to the merits. A lot of jargon. CDO cases tend to have a lot of jargon. But let's get to one really basic point. They'll cite to a lot of places about a lot of things. What they cannot cite to your satisfaction is any representation ever made by any defendant as to the market value, the market value of the preference shares. The offering circular makes very clear they have a par value of one penny, one penny. They have an aggregate liquidation value of 1,000, but aggregate liquidation value is a defined term in the offering circular. It means something very specific, that when you liquidate the assets of the CDO, these preference shares are entitled to up to $1,000 each. That says nothing about the market value. They cite to an e-mail, and I believe, if I can just get the reference. It's confidential appendix 228. Confidential appendix 228 is a schedule that LRI, LBBW, receives prior to closing. It lists a price for every security except for the preference shares. There is no price listed for the preference shares. And that's entirely consistent with the offering circular, which says the initial purchasers, Wachovia and Fortis, who are buying all the securities at the first instance, for the full value of the CDO. The CDO gets every last penny it's entitled to get, and then some. So no matter as to when the mark happened, when the mark was taken on the shares retained on Wachovia's books, that doesn't harm the CDO at all. It has no impact on the CDO. The CDO was a $1.5 billion CDO. At closing, it had slightly in excess of $1.5 billion in assets. And that's all, that is all that LBBW is entitled to look to. What our views were of the collateral, what value we may have put on the collateral or on the preference shares, entirely irrelevant. Going back to this point, they claim at times that there is a misrepresentation as to market value. And I submit to you, if you look at the evidence they cite to in the record, it simply doesn't support any such representation. No representation was made about market value because the equity shares are inherently the most risky part of the capital structure. Instead, what was told to investors is we, the initial purchasers, Wachovia and Fortis, are going to buy these securities. They fulfilled that requirement. They bought every single security. And then they carried the risk of being able to place these securities in the market. But if it's not a misrepresentation case, can it be an omissions case? And I submit to you, it can't. Not in this instance where you have a sophisticated buyer who specifically represents in the offering circular that it is not relying generally on Wachovia and Fortis for investment advice as to the soundness of this investment, not acting as a fiduciary. This is not a mom-and-pop investment where you can say there's an obligation to disclose under the securities laws. Don't apply here. There's no obligation to disclose under dealing with retail customers under FINRA rules. Doesn't apply here. This is an investment for the rarefied, sophisticated investor group. Not a confidential relationship. Absolutely not. So their theory has to be there's knowing omission to disclose a material fact, and the fact must be that the collateral is distressed. And they say the fact of the markdown itself and the difficulty in placing the shares in the market, these initial forays in the market, is enough to create an issue of fact on that point. Enough to create an issue of fact as to whether your client knew that the collateral was distressed and knowingly concealed that fact. I submit to you, Your Honor, that's a false issue that's presented by the plaintiffs, and here's why. Help me understand. What they suggest is there could have been other reasons for the collateral being marked down, and they talk about their expert who says, well, in ordinary cases, it only happens if the collateral is distressed. That's why the equity is marked down. But in this case, and that was, in fact, the situation at the motion to dismiss, where the judge didn't know why we had marked down the preference shares. That was a plausible explanation. Well, we did discovery. Why did Wachovia mark down the preference shares? And the only evidence as to why Wachovia did it is because Wachovia was doing it for accounting purposes. When the transaction closed, they were obligated to purchase all the securities. That's what initial purchasers do. It's like an underwriter, except in a private context. They take that risk on their books, and then they have to get it off their books by selling it to other investors. Well, they knew going in they'd have trouble placing the equity because of liquidity issues, not because there was bad collateral. There's not a single scrap of evidence that the people deciding to put the mark believed this was because the collateral was poor or degrading. And the proof, as I think the district judge said, is in the pudding. When they believed that they were going to get a higher set of investment banking fees, to offset those fees, they took a lower mark. When they realized that the income was actually going to be lower, they raised the mark. That was what motivated Wachovia to mark down. And frankly, Your Honor, going back to the question you started with, this is a mark that's occurring on the bottom $5.5 million of a $1.5 billion deal. When they, the plaintiffs, considered this investment, they asked Wachovia to run a scenario with 30% losses on the collateral pool. 30% of $1.5 billion. That would have wiped out lots of tranches well below their investment, and they still thought this is an investment they wanted to make. What were the liquidity issues that you just referred to? The liquidity issues are, the security you're trying to market bears the first loss, because it's at the bottom of the structure. That makes it risky, just inherently. And therefore, you have to individually negotiate transactions with potential investors as to at what price they're willing to bear that risk. And you'll see the discussion in the evidence below, it's the yield. What am I getting in this transaction for taking on that risk? So am I getting a 20% return? Those are the kinds of numbers people talked about, because this was the riskiest part of the structure. And the price would be negotiated based on getting the yield that an investor expected. That's what made it difficult to place. That's the liquidity issue. The fact of the matter is the offering circular said over and over again, there is no market for any of these securities, and there's no guarantee that a market will develop for any of these. That's the nature of the risk that Wachovia and Fortis were taking on in going into this transaction. It was up to them to place the securities. And what they did represent is we'll place them in individually negotiated transactions at varying prices. And just making sure I understand where we are in the litigation, if we agree with you on the merits, we don't have to address the capacity issue because, as you said at the beginning of your argument, it doesn't go to Article III standing. I think that's certainly an option you have, Your Honor. Thank you, Your Honor. On standing, do you agree that the plaintiff, because it's a dissolved corporation, has no capacity to sue? I want to be really clear about this. We have conceded below that the plaintiff has no capacity to file a new lawsuit. Nobody has made an argument either way about whether the plaintiff has the power under Luxembourg law to maintain this existing lawsuit. Mr. Tambay said this point is undisputed. Did you make this argument below? I'm sorry? Did you make an argument below that there's a difference between continuing a lawsuit and starting a new lawsuit? That was not the basis of the argument, the capacity argument we made below, no. The district court concluded that your client had no capacity to sue and therefore you had to show a transfer. Just to be clear, for summary judgment purposes where the defendant bears the burden to show their entitlement to relief, there is no . . . The magistrate judge found that LBBW had failed to make a sufficient showing of a transfer. That is correct. You didn't appeal that? That is correct. How can we hear that now? There is a narrow exception which would allow you directly to hear an appeal on the substitution issue. We've talked about it. It's the Spruce case about dealing with manifest injustice. If you agree with me about the practical points that I made for why this would be a silly way to look at this, then you should just grant our substitution motion. Assuming you don't want to do that, assuming you want to just consider this in a summary judgment posture, I don't think that the fact that we didn't appeal the magistrate judge's ruling on the substitution motion forecloses us from making any arguments about their failure to carry their summary judgment burden. Because it is an entirely different burden. These are discrete questions under discrete burdens of proof. And as I noted, we are the only party that has supplied you with any evidence in the appeal. Mr. Tambay cites some evidence. He talks about the failure to attach a schedule of liabilities and things like that. None of that is in their briefs on appeal. The only evidence is on pages 31 and 32 of our brief, where we explain to you the evidence that shows that a transfer, in fact, occurred. Under any choice of law, really, the language of the merger is extremely broad. It says all assets and liabilities. And there's no serious opposition to that in their briefing. They rely only on the magistrate judge's decision, which cannot be right just as a procedural matter, because it's not the case that the magistrate judge is finding that we didn't carry our burden in one case. I want to make it really clear. They might have a better argument if the magistrate judge had affirmatively found, as a matter of fact, that no transfer occurred, and we let that slide. The magistrate judge didn't find that. The magistrate judge simply said that we hadn't proved to his satisfaction that the transfer did occur, effectively leaving the question open. On summary judgment, you can't rely on the leaving it open as a reason why no reasonable fact finder could find in our favor. If there are any questions about the merits, I'd love to field them just based on Mr. Tambi's presentation, but I'm mindful of the court's time as well. Thank you. Thank you both. Well done.